# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **JESSE BARNEY HELMS,** | **Case No. 22–cv–01325–ESK–MJS** |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **OFFICER MILLER,** *et al.***,** | |
| **Defendants.** | |

**KIEL, U.S.D.J.**

**THIS MATTER** comes before the Court on a motion for summary judgment (Motion) filed by defendants John S. Cuzzupe, Officer Miller, and Salem County.[1]  (ECF No. 108.)   Plaintiff Jesse Barney Helms opposes the Motion.   (ECF No. 113.)   For the following reasons, I will grant the motion in part.

## I.    PROCEDURAL HISTORY

Plaintiff filed a *pro se* complaint on March 10, 2022 pursuant to 42 U.S.C. § 1983 (Complaint).   (ECF No. 1.)   He alleged defendant Officer Miller of the Salem County Correctional Facility (Facility) loudly screamed into his ear, causing permanent hearing loss and migraine headaches.   (*Id.* p. 6.)   Plaintiff filed an amended complaint on April 18, 2022 (Amended Complaint).   (ECF

---

[1] For purposes of this Motion, I will refer to defendants Salem County Correctional Facility and Salem County collectively as Salem County because a county jail is not a separate entity for purposes of § 1983.   *See Mitchell v. Cnty. of Bergen*, No. 23–cv–00596, 2024 WL 1526121, at *3 (D.N.J. Apr. 9, 2024) ("[C]ounty jails ... are not separate entities subject to suit under Section 1983 because they are merely an administrative arm of the ... local government.")

No. 15.)   District Judge Noel L. Hillman allowed the Amended Complaint to proceed on January 27, 2023.   (ECF No. 23.)

Plaintiff obtained counsel and filed a second amended complaint (Second Amended Complaint) on January 25, 2024.   (ECF No. 57 (Sec. Am. Compl.).)   The Second Amended Complaint added the Facility, Salem County, Facility warden John Cuzzupe, and New Jersey Department of Corrections (Department) Commissioner Victoria Kuhn as defendants.   (Sec. Am. Compl. ¶¶ 3, 4, 6.)   I granted Kuhn's motion for summary judgment on December 3, 2024.   (ECF No. 102.)

On March 27, 2025, defendants filed their Motion.   (ECF No. 108.)   Plaintiff filed opposition on May 2, 2025.   (ECF No. 113.)   On May 13, 2025, I issued a Notice and Order permitting the parties to file additional materials regarding defendants' exhaustion affirmative defense pursuant to *Paladino v. Newsome*, 885 F.3d 203 (3d Cir. 2018).   (ECF No. 115.)   Plaintiff submitted an affidavit on June 12, 2025.   (ECF No. 116.)   Defendants filed an additional certification from Cuzzupe.   (ECF No. 117.)

The Supreme Court issued its decision in *Perttu v. Richards* on June 18, 2025, holding that parties are entitled to a jury trial on exhaustion when that issue is intertwined with the merits of a claim protected by the Seventh Amendment.   605 U.S. 460, 479 (2025).   On June 23, 2025, I directed the parties to submit supplemental briefing on the applicability of *Perttu*.   (ECF No. 118.)   Plaintiff submitted a response on July 23, 2025.   (ECF No. 120.)

## II.   FACTS

### A.   <u>Allegations in Second Amended Complaint</u>

Plaintiff was detained in the Facility, located in Salem County, on February 22, 2022.   (Sec. Am. Compl. ¶¶ 4, 9, 10.)   After completing his kitchen duties, plaintiff went into the breakroom and rested his head on the

table. (*Id.* ¶¶ 11, 12.) Miller stood "very close" to plaintiff's left ear and screamed directly into it. (*Id.* ¶ 14.) She told plaintiff that she did that because "she 'was trying to give [plaintiff] a heart attack.'" (*Id.* ¶ 16.) Miller was not responding to any infractions or prison policy violations by plaintiff. (*Id.* ¶ 15.) As a result, plaintiff sustained permanent hearing loss in his left ear, as well as anxiety and depression from the hearing loss. (*Id.* ¶ 18.)

Plaintiff asserts that Salem County "promulgated policies and procedures regulating [the Facility's] treatment of detainees with dignity and respect and not to intentionally, recklessly or with deliberate indifference cause injury to detainees." (*Id.* ¶¶ 19, 20.) He argues Miller "should have been trained to follow policies and procedures regulating [the Facility's] treatment of detainees with dignity and respect and not to intentionally, recklessly or with deliberate indifference cause injury to detainees." (*Id.* ¶ 21.) According to plaintiff, Cuzzupe was responsible for policy-making and was "aware of the detention officers causing unjustifiable injuries to prisoners … ." (*Id.* ¶¶ 21, 29.) Plaintiff further asserts Cuzzupe knew, or should have known, "of the aforementioned conduct and they were aware of alternatives for preventing such conduct, they either deliberately chose not to pursue these alternatives, or they acquiesced to a long-standing policy or custom of inaction." (*Id.* ¶ 30.)

### B.    <u>Defendants' Statement of Facts</u>

Defendants assert plaintiff had a dual status as a pretrial detainee and a convicted prisoner in February 2022. (ECF No. 108–1 ¶ 1.) They state that there is "conversational activity" in the Facility's records regarding the incident. (*Id.* ¶ 2.) Plaintiff filed a request for medical treatment for his left ear on February 22, 2022. (*Id.*) He followed up his request on February 25, 2022 stating that "some 1 [sic] screamed n2 [sic] my ear causing me now headaches, slight deafness." (*Id.*) He did not mention Miller as the person who allegedly screamed in his ear. (*Id.*) He mentions the incident again on

March 4, 2022 but does not name Miller.  (*Id.* ¶ 3.)  Defendants assert that plaintiff never filed a notice of tort claim as required by the New Jersey Tort Claims Act, N.J.S.A. § 59:8–3, *et seq.* (Tort Claims Act).  (*Id.* ¶ 4.)

Miller denies shouting in plaintiff's ear and telling him that she did it to get him a heart attack.  (*Id.* ¶¶ 5, 6, 26.)  She has been reprimanded twice in her career for attendance and lateness.  (*Id.* ¶ 22.)  She received professionalism training.  (*Id.* ¶ 23.)  She was assigned to the medical department from 7am to 11pm and in housing unit B1 from 11am to 7pm on February 22, 2022.  (*Id.* ¶ 7.)  Unit B-1 is "about 200 feet from the kitchen area and totally segregated.  Every unit is secured by locked doors.  Correction officers cannot open such security doors."  (*Id.* ¶ 32.)  According to Miller, the medical department was about 50 yards away from the kitchen, and she would have had to pass through two security doors to get to the kitchen.  (*Id.* ¶ 24.)

Cuzzupe denied having any knowledge of the incident prior to being served.  (*Id.* ¶¶ 8, 28.)  He states that CCTV footage in the Facility is retained for "up to 30-60 days" but footage of the incident was not available because plaintiff did not file a grievance.  (*Id.* ¶¶ 9, 12.)  Cuzzupe denies that there is a Facility policy that authorizes screaming in an inmate's ear.  (*Id.* ¶ 11.)  During his deposition, he stated that plaintiff's injury "would not necessarily trigger an investigation, but rather providing medical attention."  (*Id.* ¶ 30.)  The Facility has Rules Governing Relationship With Inmates (Policy) that sets forth expectations of professionalism for Facility employees.  (*Id.* ¶ 13.)  The Facility Inmate Handbook (Handbook) provides instructions for filing grievances.  (*Id.* ¶ 14.)  Defendants assert there is no record of plaintiff having filed a grievance.  (*Id.*)

The Facility passed its 2022 inspection.  (*Id.* ¶¶ 15, 16.)  The inspection "requirements include having qualified training officers; new employees shall

receive orientation training prior to job assignment and additional training as needed.   Areas of training include, in part, supervision of inmates; grievance and disciplinary procedures; rights and responsibilities of inmates; human relations and communication skills; special needs of minorities."   (*Id.* ¶ 17.) The Facility was also found to be in compliance with the security and control standards, which include use of force training.   (*Id.* ¶¶ 18, 19.)

### C.    Plaintiff's Supplemental Facts

Plaintiff asserts he was a pretrial detainee at the Facility on February 22, 2022.   (ECF No. 113–3 ¶ 1.)   He was working in the Facility kitchen between 9:30am and 11:30am.   (*Id* ¶ 2.)   After he was finished, he went into the breakroom and rested his head on the table.   (*Id.* ¶ 3.)   "[W]ithout or provocation, prison guard Officer, Linda Miller purposely positioned herself very close to [p]laintiff's left ear and screamed in [p]laintiff's ear."   (*Id.* ¶ 5.) She admitted she did it to give plaintiff "a heart attack."   (*Id.* ¶ 7.)   Plaintiff identified Miller as the person who screamed in his ear.   (*Id.* ¶ 8.)

Plaintiff argues that "[i]f a prisoner in the kitchen has a medical appointment, an officer can escort prisoners from the medical unit in and out of the kitchen area."   (*Id.* ¶ 39.)   Cuzzupe never asked Miller if she was in the kitchen on February 22, 2022, and there is no way to track Facility officers' movements within the Facility.   (*Id.* ¶¶ 40, 41.)

Plaintiff was transferred out of the Facility to state prison.   (*Id.* ¶ 9.)   He reported the incident at the prison.   (*Id.* ¶10.)   He did not report the incident at the Facility because he feared retaliation from the officers.   (*Id.* ¶ 11.) Plaintiff states that Facility prisoners are required to file grievances via the kiosk, which became unavailable to him when he was transferred to South Woods State Prison (South Woods).   (*Id.* ¶¶44, 45.)   The Handbook indicates that prisoners with pending grievances at the time of their transfer "lose all standing with respect to any further internal administrative remedy of the

matter." (*Id.* ¶ 47.)   It does not provide instructions to prisoners who wish to file grievances but are about to transfer out of the Facility. (*Id.* ¶ 48.)

Plaintiff submits an expert liability report from Darren Stocker, who has worked in the Criminal Justice field for more than 35 years. (*Id.* ¶¶ 50, 52.) Stocker opines that plaintiff's injuries were caused by Miller's inappropriate use of force. (*Id.* ¶ 57.)   He also concludes that Salem County and Cuzzupe "had inadequate oversight, supervision, and discipline over its employees at" the Facility. (*Id.* ¶ 62.)   A medical report from Dr. Patrick Hall concludes that plaintiff suffered permanent hearing loss in his left ear because of the incident. (*Id.* ¶¶ 64, 66.)   Dr. Geral Pflum also concluded that there was a causal relationship between the incident and plaintiff's injuries. (*Id.* ¶¶ 67, 69.)

Plaintiff mailed a letter to the Clerk of the Court on April 25, 2022 describing the incident. (*Id.* ¶ 13.)   He asserts that Cuzzupe testified that he received a Notice of Tort claim sometime in 2022. (*Id.* ¶ 22.)   Plaintiff further argues that Cuzzupe admitted that it was "not the policy to investigate when a prisoner reports an injury as the result of an assault" and that "there is no bright line to investigate assaults." (*Id.* ¶¶ 23, 24.)   Plaintiff reported his injury to Nurses Woodside and Mecholsky and psychologist Ms. Perry at the Facility and told them that it was because someone screamed into his ear. (*Id.* ¶ 29.)   None of these people reported the injury to prison authorities to conduct an investigation. (*Id.* ¶ 30.)

### III.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).   A fact is material

if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party has the initial burden of showing the basis for its motion and that there is no genuine dispute of material fact. *See Celotex Corp.*, 477 U.S. at 323. The moving party must cite specific materials in the record. Fed. R. Civ. P. 56(c)(1)(A). "[T]he burden on the moving party may be discharged by 'showing' … that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the moving party has satisfied its burden, the non-moving party, "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Anderson*, 477 U.S. at 251).

## IV.  DISCUSSION

### A.  <u>New Jersey Tort Claims Act</u>

Defendants argue that they are entitled to judgment as a matter of law on plaintiff's Tort Claims Act claims because plaintiff did not comply with the notice procedures. (ECF No. 108–2 p. 20.)

The Tort Claims Act states in relevant part that "no action shall be brought against a public entity or public employee under this act unless the claim upon which it is based shall have been presented in accordance with the procedure set forth in this chapter." N.J.S.A. § 59:8–3(a). Plaintiffs must file a notice of tort claim with the public entity being sued within 90 days of the incident and wait for a response before filing a lawsuit. N.J.S.A. § 59:8–8(a). The notice requirement is "a jurisdictional precondition to filing suit,"

*Ptaszynski v. Uwaneme*, 371 N.J. Super. 333, 343 (N.J. Super. Ct. App. Div. 2004) (internal quotation marks omitted), and suits that do not comply with the notice provision are "forever barred from recovering against a public entity or public employee."  N.J.S.A. § 59:8–8.

There are disputed facts that, although they do not prevent the grant of summary judgment, are worth noting.  Defendants submit the certification of Stacey L. Pennington, the Deputy Admin/COB/PIO, Personnel Director, and Risk Manager for the County of Salem in support of the Motion.  (ECF No. 108–5 p. 44.)    Pennington certifies that she examined the Notices of Tort Claims from 2021 to the present and did not find "a Notice of Tort Claim submitted by or on behalf of the Plaintiff, Jesse Barney Helms, for the subject matter alleged incident of February 22, 2021."  (*Id.* p. 45.)   However, plaintiff alleges his injury occurred on February 22, 2022, not 2021.   (Sec. Am. Compl. ¶ 10.)   Moreover, Cuzzupe testified that he became aware of plaintiff's allegations "when the Tort Claim was served."   (ECF No. 113–8 pp. 6, 7.)   It is plausible that Pennington mistakenly wrote 2021 instead of 2022.   It is also plausible, as defendants argue, that Cuzzupe confused receiving a Tort Claims Act notice with being served with the Complaint.   (*See* ECF No. 114–1 pp. 5, 6.)   I cannot make these assumptions and decide these disputes in defendants' favor on summary judgment, but ultimately I find that these disputes do not create a genuine issue of material fact because plaintiff concedes he did not file a Notice of Tort Claim by invoking the substantial compliance exception.   (ECF No. 113–2 pp. 14, 15, 16.)

"The doctrine of substantial compliance is an equitable one which is utilized to avoid the harsh consequences that flow from technically inadequate actions that nonetheless meet a statute's underlying purpose." *Cnty. of Hudson v. State, Dep't of Corr.*, 208 N.J. 1, 22 (2011) (internal quotation marks

omitted).   "A court deciding a substantial compliance claim considers the following factors:

> (1) the lack of prejudice to the defending party;
>
> (2) a series of steps taken to comply with the statute involved;
>
> (3) a general compliance with the purpose of the statute;
>
> (4) a reasonable notice of petitioner's claim, and
>
> (5) a reasonable explanation why there was not a strict compliance with the statute.

*H.C. Equities, LP v. Cnty. of Union*, 247 N.J. 366, 386 (2021) (internal citation omitted).   "In Tort Claims Act cases, the doctrine of substantial compliance 'has been limited carefully to those situations in which the notice, although both timely and in writing, had technical deficiencies that did not deprive the public entity of the effective notice contemplated by the statute.'"   *Id.* (quoting *D.D. v. Univ. of Med. & Dentistry of New Jersey*, 213 N.J. 130, 159 (2013)).

Plaintiff argues his April 25, 2022 letter to the Clerk's Office, ECF No. 19, satisfies the substantial compliance doctrine.   (ECF No. 113–2 p.14.)   The letter recounts plaintiff's visit to the audiologist and asserts that Miller's actions caused him 40% hearing loss.   (ECF No. 19 p. 1.)   He now argues that "[d]efendants have not shown any prejudice that [they have] suffered as a result of failing to receive notification within ninety (90) days from the incident.   Pro se [p]laintiff attempted to comply with the reporting requirements by sending a letter of April 25, 2022, to the Court system which substantially complied with all the information required under" the Tort Claims Act.   (ECF No. 113–2 pp. 16, 17.)

New Jersey courts have consistently concluded that "the filing of a complaint would not be a substitute for the notice required by statute, whether

the complaint was filed within the 90-day or the one-year period." *Guzman v. City of Perth Amboy*, 214 N.J. Super. 167, 171–72 (N.J. Super. Ct. App. Div. 1986); *see also Cnty. of Hudson*, 208 N.J. at 23 ("[E]ven the most generous application of the substantial compliance doctrine has rejected the notion that filing a complaint is itself a substitute for notice.")   If the filing of a formal complaint does not satisfy the substantial compliance standard, then neither would the filing of a letter on the docket.

"After the expiration of that one-year period to file a late notice of claim … the court is without authority to relieve a plaintiff from his failure to have filed a notice of claim, and a consequent action at law must fail." *H.C. Equities*, 247 N.J. at 383 (internal quotation marks omitted).   Therefore, I conclude that defendants are entitled to judgment as a matter of law on the Tort Claims Act claims.

## B.   Failure to Exhaust

Defendants further argue that plaintiff's claims in the Second Amended Complaint should be dismissed because he failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act (PLRA).   *See* 42 U.S.C. § 1997e(a).

Under the PLRA, prisoners must "exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." *Ross v. Blake*, 578 U.S. 632, 635 (2016) (quoting 42 U.S.C. § 1997e(a)).   "[T]his provision 'requires proper exhaustion' of available prison grievance procedures, meaning a prisoner 'must complete the administrative review process in accordance with the applicable procedural rules ... as a precondition to bringing suit in federal court.'" *Perttu v. Richards*, 605 U.S. 460, 465 (2025) (omission in original) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2007)).   "A prisoner must exhaust these remedies 'in the literal sense[;]' no further avenues in the prison's grievance process should be available." *Smith v. Lagana*, 574 F. App'x

130, 131 (3d Cir. 2014) (quoting *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004)). "Failure to exhaust is an affirmative defense the defendant must plead and prove; it is not a pleading requirement for the prisoner-plaintiff." *Small v. Camden Cty.*, 728 F.3d 265, 268 (3d Cir. 2013).

A district court may decide whether plaintiffs exhausted their administrative remedies without a jury even if there are disputed facts after providing notice to the parties and an opportunity to submit further evidence. *Paladino v. Newsome*, 885 F.3d 203, 211 (3d Cir. 2018); *Small*, 728 F.3d at 268. However, "parties have a right to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim that falls under the Seventh Amendment." *Perttu*, 605 U.S. at 468.

I conclude that a jury determination is not required under *Perttu*. The *Perttu* plaintiff alleged that he was sexually abused by the defendant, a prison employee. *Id*. at 464. Defendant raised PLRA exhaustion as an affirmative defense to plaintiff's § 1983 complaint, and plaintiff argued that the prison remedy system had been unavailable to him because defendant intercepted and destroyed previously filed grievances and threatened to kill plaintiff if he filed more. *Id*. The Supreme Court concluded the merits of plaintiff's claim were intertwined with the exhaustion issue "because both depend on whether [defendant] did in fact destroy [plaintiff's] grievances and retaliate against him." *Id*. Therefore, plaintiff was entitled to a jury trial on the exhaustion issue. This is not the case here.

Plaintiff is proceeding on claims that Miller violated his Eighth and Fourteenth Amendment rights by shouting in his ear, allegedly causing permanent hearing loss, and that Salem County and Cuzzupe maintained policies or practices that directly caused that injury. His argument that he was unable to exhaust the Facility's administrative remedies stems from his

transfer to South Woods. Thus, the exhaustion issue in this case is not intertwined with the merits of the Second Amended Complaint.

"[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Defendants have submitted a portion of the Handbook in support of their motion. (ECF No. 108–5 pp. 68, 69.) The Handbook provides that "[a]n inmate may file a grievance at any time to bring a problem to staff's attention." (*Id.* p. 68.) "Grievances are to be filled out on the inmate Kiosk by using the Inmate Complaints/Grievance option on the kiosk." (*Id.*) "In the event a grievance cannot be resolved to the inmate's satisfaction by action at the department head   level within seven days, a Grievance Committee is convened to resolve the issue." (*Id.* p. 69.) The committee has 15 days to make a decision, and an inmate may appeal within five working days to the Administrator. (*Id.*) The Administrator has 10 working days to make a final decision. (*Id.*) "Inmates who have a pending grievance at the time of release lose all standing with respect to any further internal administrative remedy of the matter." (*Id.*) "All complaints/ grievances are filed and kept for a period of three years." (*Id.*) Handbook page 44, the "basis for grievance" section, was not included in the submission. (*Id.* pp. 68, 69.)

Plaintiff does not argue that he did file a grievance on the Facility's kiosk. Instead, he argues that the grievance system was not available to him since he transferred to South Woods less than 60 days after the incident.[2] (ECF No. 113–2 p. 17); *see Ross v. Blake*, 578 U.S. 632, 642 (2016) ("An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.") An

---

[2] Plaintiff argued at his deposition that he did not file a grievance because he was afraid of retaliation. (ECF No. 113–6 pp. 10, 11). Plaintiff later stated he was "just assuming" he would be retaliated against, (*id.* p. 11), but this "generalized fear of retaliation" is not enough to show that administrative remedies were unavailable. *Williams v. Gavin*, 640 F. App'x 152, 155 (3d Cir. 2016).

administrative procedure is unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," is "so opaque that it becomes, practically speaking, incapable of use," or "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643–44.

A prisoner's transfer to a new facility does not, by itself, excuse compliance with the PLRA's exhaustion requirement. "Such a limitation would permit a plaintiff who was transferred to a new institution after an incident to avoid the duty to properly exhaust the administrative remedies available to him in his prior institution." *In re Bayside Prison Litig.*, No. 97–cv–05127, 2008 WL 2387324, at *3 (D.N.J. May 19, 2008). Accordingly, plaintiff's argument that his transfer rendered administrative remedies unavailable is without merit.

At the same time, plaintiff's transfer does not necessarily mean that he failed to exhaust administrative remedies. The Facility's grievance policy imposes no temporal limitation and expressly provides that a grievance may be filed "at any time." (ECF No. 108–5 p. 68.) If the record showed that the filing deadline expired before plaintiff left the Facility, defendants' arguments would prevail because untimely or otherwise procedurally deficient attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (finding that inmate failed to properly exhaust because he submitted an administrative complaint outside the time allowed under his prison's policy). But because no such deadline exists here, plaintiff's transfer prior to filing a grievance, without more, is insufficient to establish a failure to exhaust. *See Bayside Prison Litig.*, 2008 WL 2387324, at *4 (noting that transferred plaintiff "did not fail to properly exhaust his administrative remedies because Bayside's administrative process contains no time limit for filing" a grievance). To succeed on their

exhaustion defense, defendants must show that plaintiff failed to exhaust South Woods's available remedies.  *See id.* at *3–4 (noting that defendants had to show plaintiff did not exhaust administrative remedies at his original prison and the prison to which he was transferred).

"The burden to plead and prove failure to exhaust as an affirmative defense rests on the defendant."  *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018).  Defendants have not presented any evidence regarding South Woods's administrative remedy system, and there are too many unanswered questions about the Facility's grievance policy as it relates to transferred inmates. [3]  Therefore, I must deny their request to dismiss the Second Amended Complaint for failure to exhaust.

## C.    **Excessive Force**

Miller seeks summary judgment on plaintiff's Eighth Amendment excessive force and Fourteenth Amendment unreasonable force claims against her.  (ECF No. 108–2 p. 30.)   "There are two issues that appear to arise from this claim: (1) whether the alleged conduct is sufficient for an excessive force claim; and (2) whether the alleged event actually occurred."   (ECF No. 108–2 p. 30.)

It was previously presumed that plaintiff was a pretrial detainee in February 2022, but defendants have presented evidence that plaintiff had a dual status as a convicted prisoner in February 2022.  (ECF No. 114–4 p. 2

---

[3] For example, the Handbook states that "[i]nmates who have a pending grievance at the time of release lose all standing with respect to any further internal administrative remedy of the matter," (ECF No. 108–5 p. 69), which implies that grievances that have not been resolved by the time an inmate is transferred will be dismissed.  However, Cuzzupe certified that if "plaintiff had filed a grievance in connection with the alleged incident … an investigation would have commenced and proceeded to conclusion regardless of whether the inmate was transferred or discharged."  (ECF No. 117–1 ¶ 5.)  Defendants provide no explanation for this apparent discrepancy.

(transfer receipt sending plaintiff to state prison on March 14, 2022); ECF No. 108–5 p. 147 (plaintiff's deposition testimony that he was sentenced in January 2022).)    The Third Circuit "has held that a parolee incarcerated while awaiting trial or sentencing on new charges is considered a pretrial detainee."    *Martin v. Fayette Cnty. Prison*, No.  19–cv–01233, 2020 WL 13845097, at *4 (W.D. Pa. Mar. 25, 2020), *report and recommendation adopted*, No. 2:19–cv–01233, 2020 WL 13845096 (W.D. Pa. Apr. 20, 2020); *see also U.S. v. Dobson*, 585 F.2d 55, 59 (3d Cir. 1978).    However, plaintiff was not released on parole and rearrested for a new offense; he remained in the Facility after sentencing to await resolution of his other charges.

"When faced with such 'dual status' plaintiffs, other courts have found that the Eighth Amendment provides the appropriate constitutional framework." *Brady v. Jones, et al.*, No. 2:21–cv–00489, 2025 WL 2840812, at *14 (E.D. Cal. Oct. 7, 2025); *see also Whitehead v. Garcia*, No. 20–cv–01087, 2024 WL 4102045, at *6 (D.N.M. Aug. 27, 2024) ("[A] convicted prisoner simultaneously serving his sentence and facing new charges has passed the 'critical juncture' of conviction."), *report and recommendation adopted*, No. 1:20–cv–01087, 2024 WL 4216004 (D.N.M. Sept. 17, 2024); *Miller v. Ninkovic*, No. 14–cv–1603, 2017 WL 244846, at *1 (E.D. Wis. Jan. 20, 2017) (noting plaintiff "did not lose his status as a convicted prisoner merely because he was transferred to a different location"); *Joost v. Cornell Corr., Inc.*, No. 97–cv–00512T, 1998 WL 939531, at *2 (D.R.I. Dec. 11, 1998) ("The fact that for a portion of the time that [plaintiff] was incarcerated … he was awaiting retrial on the firearm charge does not obviate the fact that he was also imprisoned as a convicted felon.")    I am persuaded by the reasoning of the other courts and conclude that the Eighth Amendment is the appropriate standard for plaintiff's excessive force claim.[4]

---

[4] Although defendants do not move for summary judgment on plaintiff's Fourteenth Amendment state-created danger claim, Sec. Am. Compl. ¶¶ 83, 84, 85, 86, 87, 88, 89, I exercise my authority to *sua sponte* dismiss it for failure to state a claim.

1.    <u>**Whether the Incident Took Place**</u>

Defendants' first argument in favor of summary judgment is that the evidence the encounter took place is "insubstantial" and "no more than [p]laintiff's accusation." (ECF No. 108–2 p. 31.) Miller testified in a deposition that she was in the medical unit "40 or 50 yards" away from the kitchen break room at the time of the alleged incident.  (ECF No. 108–5 p. 89.) She stated that she would have had to go through two secured doors to get to the kitchen break area from the medical unit.  (*Id.* p. 90.)  Cuzzupe testified that only central command could open the secured doors and that an individual officer would not have been able to open the doors by themself.  (*Id.* p. 113.) Miller emphatically denied screaming in plaintiff's ear and telling him it was to give him a heart attack.  (*Id.* p. 92.)  Defendants also point to the fact that plaintiff failed to identify Miller as the person who screamed in his ear as part of his request for medical attention.  (*Id.* p. 37.)  They argue that Miller's denial, the implausibility of an officer moving through two secure doors to the kitchen break room, and plaintiff's failure to specifically name Miller in his requests to medical overwhelmingly show that the incident did not occur. (ECF No. 108–2 pp. 31, 32.)

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence;

---

*See* 28 U.S.C. §1915(e)(2) (allowing district courts to dismiss "at any time" claims for failure to state a claim in cases in which the plaintiff is proceeding *in forma pauperis*). "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n. 7 (1997); *see also Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010).  Plaintiff may not bring a state-created danger claim "based on the conditions of his confinement and the alleged failure … to ensure his safety" because his claims "fit squarely within the Eighth Amendment's prohibition on cruel and unusual punishment … ."  *Beenick v. LeFebvre*, 684 F. App'x 200, 205 (3d Cir. 2017) (internal quotation marks omitted).

instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)).   Plaintiff testified at his deposition that Miller was "without a doubt" the person who screamed in his ear.   (ECF No. 113–6 p. 8.)   He testified that she told him that she had done it "to give [him] a heart attack playing around."   (*Id.*)   This is enough to defeat summary judgment, *see Ortiz v. Cnty. of Cumberland*, No. 21–cv–19953, 2025 WL 2473703, at *9 (D.N.J. Aug. 28, 2025) ("Plaintiff need not produce corroborating evidence of his deposition testimony; a plaintiff's sworn deposition testimony alone may be sufficient to create a genuine dispute of material fact."), but it is not the only contradictory evidence.   Cuzzupe admitted that there was no way to verify where individual officers went inside the Facility in 2022 and that Miller could have escorted a person from the medical area to the kitchen area.   (ECF No. 108–5 pp. 113, 114.)   Therefore, it is not impossible that she was in the kitchen break area at the time of the incident.   Plaintiff also filed requests for medical attention the same day as the incident because someone yelled in his ear.   (*Id.* p. 37.)   The contemporaneous requests for medical attention support plaintiff's claims.

Miller's arguments go towards the credibility of plaintiff's version of events, but only a jury can decide which version is more credible. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge … ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Ortiz*, 2025 WL 2473703, at *9 ("[A]lthough [d]efendants make good arguments that cast great doubt on [p]laintiff's credibility, those are more proper for trial.")   I must presume the incident took place for summary judgment purposes.

### 2. Satisfaction of the Eighth Amendment Standard

A claim under the Eighth Amendment contains subjective and objective components. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). A defendant "must act with a 'sufficiently culpable state of mind,' and the conduct must be objectively harmful enough to violate the Constitution." *Gibson v. Flemming*, 837 F. App'x 860, 862 (3d Cir. 2020) (per curiam) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 303 (1991)). "In addressing the objective component of an Eighth Amendment claim, the question is whether the injury was more than *de minimis*." *Id.* Plaintiff has submitted evidence suggesting that he sustained hearing loss from the incident. (ECF No. 113–6 p. 10.) Accordingly, I conclude that plaintiff has satisfied the objective prong for summary judgment purposes. *See Edrei v. Maguire*, 892 F.3d 525, 538 (2d Cir. 2018) (noting that "auditory pain, migraines, tinnitus, and hearing loss, of varying degrees and duration" qualify as injuries to state a constitutional violation.)

For the subjective component, I must consider "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Ricks v. Shover*, 891 F.3d 468, 480 (3d Cir. 2018) (internal quotation marks omitted). The relevant factors for consideration are:

> (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response.

*Id.* (internal quotation marks omitted) (citing *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000).)

Defendants argue that "if one assumes the incident occurred as alleged by [p]laintiff, at most it was intended as a joke, not with an intent to injure. In

fact, yelling may not be reasonably considered to be force in the sense that excessive force is used in these types of situations." (ECF No. 108–2 p. 31.) "It is well settled that verbal harassment of a prisoner, although deplorable, does not violate the Eighth Amendment." *Robinson v. Taylor*, 204 F. App'x 155, 156 (3d Cir. 2006) (per curiam). Yet the Second Circuit has concluded that the use of long range acoustic devices—a device that can "propel piercing sound at higher levels ... than are considered safe to human ears"—to disperse protestors could be considered unreasonable force under the Fourteenth Amendment. *Edrei v. Maguire*, 892 F.3d 525, 530 (2d Cir. 2018) (omission in original). Although the Second Circuit made this determination under the Fourteenth Amendment, I conclude that it is equally applicable under the Eighth Amendment. Courts have previously recognized that excessive noise in a prison can constitute unconstitutional conditions of confinement when it is "excessive and pervasive" and "pose[s] a serious risk of injury … ." *Whitney v. Wetzel*, 649 F. App'x 123, 127 (3d Cir. 2016) (per curiam); *Tineo v. Fed. Bureau of Prisons*, No. 19–cv–19403, 2021 WL 689144, at *3 (D.N.J. Feb. 23, 2021) ("High levels of noise are not per se Eighth Amendment violations; a violation requires a risk of injury … .") Defendants' assertion that "[p]ersons wear ear protection when using heavy machinery, chainsaws; or using firearms or cannons in the military" supports a conclusion that sound can cause physical harm. (ECF No. 108–2 p. 31.) Therefore, it stands to reason that sound can constitute force under the Eighth Amendment excessive force claim when it is intentionally weaponized against and causes harm to a prisoner.

Having concluded that sound can be considered force in appropriate circumstances, I must now evaluate whether plaintiff has submitted enough evidence to create a dispute of material fact as to his Eighth Amendment claim. I find that he has and will deny summary judgment.

Defendants argue that Miller's actions, if plaintiff is believed, were no more than negligent conduct. (ECF No. 108–2 p. 31.) However, they do not address the relevant factors in deciding the subject component other than denying the incident occurred and arguing that plaintiff's injuries were minimal. (*Id.*) I must presume that the incident occurred for the reasons stated *supra*, and there is enough evidence of a substantial injury to have a jury consider the question. Plaintiff alleges Miller shouted directly into his ear as horseplay or as a joke, causing permanent hearing loss. If a jury believes plaintiff, there was no threat to the safety of staff and inmates that warranted yelling directly into plaintiff's ear. Under plaintiff's version of events, Miller applied physical force capable of causing injury for no legitimate penological purpose and not in a good-faith effort to maintain or restore discipline. Because there are genuine disputes regarding whether the incident occurred, summary judgment on the Eighth Amendment claim will be denied.

### D.  <u>Supervisory Liability</u>

Defendants also seek summary judgment on plaintiff's supervisory liability claims against Cuzzupe.[5] (ECF No. 108–2 p. 24.) According to plaintiff, "there are policies/customs in place [that caused] [p]laintiff's injuries, specifically the lack of training and supervision that facilitated Ms. Miller's unjustifiable assault upon plaintiff." (ECF No. 113–2 p. 22.) He asserts that Cuzzupe "knew or should have known that the training and/or supervision of the [Facility] staff was inadequate, insufficient, or inappropriate to have prevented the injuries sustained by plaintiff." (*Id.* pp. 22, 23.)

---

[5] The relevant portion of the Second Amended Complaint also brings supervisory liability claims against Miller, but "[p]laintiff cannot assert supervisor liability against someone who was not a supervisor." *Waters v. Saez*, No. 19–cv–08811, 2020 WL 7351214, at *5 (D.N.J. Dec. 15, 2020).

Defendants submitted the Facility's Policy in support of their Motion. (ECF No. 108–5 pp. 62, 63, 64, 65, 66.)   The Policy's purpose "is to establish a clear set of rules that govern the appropriate and acceptable relationship between correctional employees and inmates."   (*Id.* p. 62.)   The Policy directs employees "to maintain a professional, ethical and moral working relationship [with] the inmates detained at the facility."   (*Id.*)   "To accomplish this the administration and supervisory staff must be diligent in their efforts to strictly adhere to this policy in order to set the proper example."   (*Id.*)   Under the Policy, employees are not permitted to "fraternize or other indulge in undue familiarity with inmates …   The word fraternize implies an association with an individual on equal terms."   (*Id.*)   It further directs employees to treat detainees with "common courtesy and consideration … ."   (*Id.* p. 63.)   "The use of profanity, racial or derogatory remarks by employees toward inmates is not permitted."   (*Id.* p. 64.)   "Correctional employees are required to rise above the level of the inmate to handle difficult situations in an effective and professional manner."   (*Id.*)   The Policy also briefly addresses the use of force:

> There shall be no corporal punishment and no employee shall strike or lay hands on an inmate unless it is in the defense of themselves or necessary to prevent escape or serious injury to persons or damage to property, or to quell a disturbance.   In such cases, only the amount of force necessary to maintain control of the situation is to be used, and proper reports are to be filed with supervisory staff following the incident, in accordance with the Use of Force policy.

(*Id.*)   Employees are warned that "[a]ny act, conduct, behavior or incident that constitutes a violation of this policy shall result in employee disciplinary action, which may, based upon the severity of the violation, result in the disposition of disciplinary sanctions up to and including termination."   (*Id.* p. 65.)   Miller testified during her deposition that she received training regarding the policies and procedures for inmate interactions.   (*Id.* p. 86.)   She also received professionalism training.   (*Id.* p. 87.)   She further testified that she had been

reprimanded twice in her career for attendance and lateness.   (*Id.* p. 83.)   She agreed that yelling directly into plaintiff's ear as horseplay would violate the Policy.   (*Id.* p. 92.)

Defendants also submitted a portion of the Facility's mission statement. (*Id.* p. 80.)   The mission statement includes goals, which includes "treat[ing] all offenders with dignity and respect."   (*Id.*)   A message from Cuzzupe appears, stating that Facility employees "are expected to treat all people, civilian or inmate, with courtesy and respect.   The staff at this facility are required to establish and maintain a level of integrity that results in honest and ethical conduct, moral behavior and superior performance in all aspects of their work."   (*Id.*)

To prevail, plaintiff must first "identify a supervisory policy or practice that the supervisor failed to employ."   *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 317 (3d Cir. 2014), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015).   He must then provide sufficient facts that, if true, would show: "(1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure."   *Id.* (citing *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989)).   He has not done so here.

Plaintiff relies on the absence of a policy expressly prohibiting horseplay or jokes between Facility employees and detainees as evidence of Cuzzupe's supervisory liability.   (ECF No. 113–2 pp. 22, 23.)   However, both Miller and Cuzzupe agreed that shouting in plaintiff's ear as he alleges would have violated the Policy on professionalism.   (ECF No. 108–5 p. 92 (Miller); ECF No. 113–8 p. 25 (Cuzzupe).)   Therefore, it is clear that there was a policy

prohibiting Miller's alleged conduct. Plaintiff also has not shown that Cuzzupe was aware of an unreasonable risk of injury. He points to Cuzzupe's statement during his deposition that there have been "many internal investigations" during Cuzzupe's tenure as warden "where professionalism is challenged," but Cuzzupe was unable to recall specifics about any of the incidents. (ECF No. 113–8 pp. 23, 24.) Cuzzupe's testimony does not indicate the investigations were about officers engaging in horseplay with inmates, only about "professionalism" in general. (*Id.*) The Policy addresses different kinds of conduct that falls under the "professionalism" umbrella, so it does not tend to prove that Cuzzupe had previously investigated other "horseplay" incidents. (ECF No. 108–5 pp. 62, 63, 64, 65, 66.)[6]

"The essence of the type of claim ... is that a state official, by virtue of his or her *own* deliberate indifference to *known* deficiencies in a government policy or procedure, has allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and that such an injury does occur." *Barkes*, 766 F.3d at 319–20 (emphasis in original). Plaintiff has not submitted evidence that there were any previous incidents of horseplay between officers and inmates such that Cuzzupe would have been aware of the risk of injury. As Miller's disciplinary history only concerned absenteeism and timeliness, there is no indication that Cuzzupe was aware that there was an unreasonable risk that Miller would act inappropriately toward an inmate. Without that evidence, plaintiff cannot show that Cuzzupe was deliberately indifferent to his constitutional rights. Therefore, I will grant summary judgment to Cuzzupe.

---

[6] Cuzzupe testified that the investigation files were available, but plaintiff has not produced any that would support his argument. (ECF No. 113–8 p. 24.)

E.    *Monell* **Liability**

Defendants also seek summary judgment on plaintiff's claims against Salem County.   As a municipality, Salem County "cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)).   Plaintiff can establish Salem County's liability in two ways. "A plaintiff may put forth that an unconstitutional policy or custom of the municipality led to his or her injuries, or that they were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'"   *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (internal citation omitted)(quoting *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)).   Here, plaintiff asserts that Salem County failed to train and supervise Facility staff sufficiently to prevent his injury. (ECF No. 113–2 pp. 22,23.)   "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

To succeed, plaintiff must demonstrate that Salem County's failure to train its employees "amount[s] to deliberate indifference on the part of the municipality." *Forrest*, 930 F.3d at 106 (citing *Est. of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019).)   "This consists of a showing as to whether (1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Id.* (citing *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999)).   "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62.

Plaintiff has not presented any evidence that Salem County policymakers were aware of a "horseplay" problem with a history of mishandling at the Facility.   Instead, plaintiff advances a single-incident theory of liability, which allows "the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."   *Id.* at 64. "Liability in single-incident cases depends on the likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."   *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223–24 (3d Cir. 2014) (cleaned up).   This exception only applies in a "narrow range" of cases, and this is not one of them.   *See Thomas*, 749 F.3d at 224–25 (concluding single-incident theory could apply because "[a] reasonable jury could conclude based on the frequency of fights and the volatile nature of the prison" that the lack of de-escalation and intervention training would lead to the violation of rights).   There is no evidence from which a reasonable jury could conclude that plaintiff's injury was the highly predictable consequence of failing to have a policy specifically directed at horseplay between officers and inmates.[7]   Therefore, plaintiff has not shown that there is a genuine dispute of

---

[7] Plaintiff submits an expert report opining that "Cuzzupe and [Salem County] knew, or should have known, that the training of the [Facility] staff, employees, and supervisors was inadequate, or inappropriate to prevent the types of injuries sustain by" plaintiff.   (ECF No. 113–10 p. 11.)   The expert further states that plaintiff's injuries were "predictable and preventable."   (*Id.* p. 12.)   As a preliminary matter, "[u]nsworn expert reports are inadmissible on a summary judgment motion."   *Snead v. Casino*, 700 F. Supp. 3d 203, 215 (D.N.J. 2023) (citing *Fowle v. C&C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989).)   Plaintiff's expert report was not sworn to under penalty of perjury.   (*See* ECF No. 113–10 p.12.)   Additionally, the report's "conclusions are largely inadmissible net opinions" because they are presented without connecting them to the facts of the case.   *Snead*, 700 F. Supp. 3d at 216.   "The net opinion rule requires the expert to give the 'why and wherefore' of the opinion, rather than a mere conclusion."   *Curtis v. Besam Grp.*, No. 05–cv–02807, 2007 WL 3232589, at *7 (D.N.J. Oct. 31, 2007); *see also Faragalla v. Otundo*, 626 F. Supp. 3d

material fact regarding Salem County's deliberate indifference to his constitutional rights.

Plaintiff also has not satisfied the causation element of a failure to train claim. "To sustain a claim based on a failure to train theory, the identified deficiency in the training program must be closely related to the ultimate constitutional injury." *Thomas*, 749 F.3d at 226 (cleaned up). "Liability cannot rest only on a showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury.'" *Id.* (quoting *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1029–30 (3d Cir. 1991).) "Rather, the causation inquiry focuses on whether the injury could have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Id.* (cleaned up). Plaintiff has not presented any evidence from which a reasonable juror could conclude that Salem County's failure to train the Facility's officers directly caused plaintiff's injuries.

For these reasons, I will grant summary judgment to defendants on plaintiff's *Monell* claim.

## V.    CONCLUSION

For the reasons stated above, I will grant summary judgment to Cuzzupe and Salem County on all claims. I will grant summary judgment to Miller on plaintiff's state law claims for failure to comply with the Tort Claims Act and on plaintiff's Fourteenth Amendment claims. Summary judgment on the

---

783, 788 (D.N.J. 2022) (finding expert report was an inadmissible net opinion when expert's "finding on causation [was] solely derived from [plaintiff's] representations.")

Eighth Amendment claim against Miller is denied.   An appropriate Order accompanies this Opinion.


_/s/ Edward S. Kiel_
**EDWARD S. KIEL**
UNITED STATES DISTRICT JUDGE

Dated: October 29, 2025